322 F.2d 11
 DELTA ENGINEERING CORPORATION and the Travelers Insurance
Company, Appellants,
v.
Joseph Ruby SCOTT et al., Appellees.
COLUMBIAN ROPE COMPANY, Appellant,
v.
Joseph Ruby SCOTT, Appellee.
INDEMNITY INSURANCE COMPANY OF NORTH AMERICA, Appellant,
v.
Joseph Ruby SCOTT, Appellee.
Joseph Ruby SCOTT, Appellant,
v.
DELTA ENGINEERING CORPORATION et al., Appellees.
 No. 19861.
 United States Court of Appeals Fifth Circuit.
 Aug. 15, 1963.
 
 Robert B. Acomb, Jr., George Denegre, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for Delta Engineering Corp. and Travelers Ins. Co.
 A. R. Christovich, Jr., Christovich & Kearney, New Orleans, La., for Columbia Rope Co.
 Charles Kohlmeyer, Jr., Thomas W. Thorne, Jr., Lemle & Kelleher, New Orleans, La., for Indemnity Ins. Co.
 Donald V. Organ & Louise S. Korns, New Orleans, La., for Joseph Ruby Scott.
 Christopher Tompkins, New Orleans, La., Deutsch, Kerrigan & Stiles, New Orleans, La., of counsel, for National Supply Co.
 Before CAMERON and BROWN, Circuit Judges, and WHITEHURST, District judge.
 JOHN R. BROWN, Circuit Judge.
 
 
 1
 In this five-sided Donnybrook tried as a jury civil action thanks in part to the Louisiana Direct Action Statute which gave the Court jurisdiction over some Louisiana citizens to determine rights under a mixture of state and federal maritime principles, none are happy and all appeal. This comes about from the injury received by Plaintiff Scott when his workboat fell on him as a result of a rope sling parting during the time the vessel was suspended by a dragline crane operated by Delta. This complexity, however, is more apparent than real and not more than a single new singnificant legal question is presented. As for the balance, it all washed out with the jury verdict so we once again serve the thereapeutic function of giving heed to arguments which had to prevail elsewhere, but did not.[1]
 
 
 2
 Scott was the owner of the Lugger BARBARA MARIE, about 45 feet long. She was under an oral, informal , daily time charter to Placid. Under the charter, Placid, the charterer, was to supply fuel, lube oil and all rope needed for lines and the like. Just the day before the accident, Placid furnished a coil of brand new 1 1/4 inch manila rope manufactured by Columbian and sold by its distributor National Supply. And thereby hangs this tale if not the BARBARA MARIE.
 
 
 3
 Scott reported to Placid that repairs wre required. To avoid a two-day lay up which would take the needed vessel out of charterer's service, Placid requested Delta to hoist the vessel's stern by use of Delta's dragline crane mounted on a barge. Delta was engaged in pipeline construction work for Placid in this amphibious oilfield. For this service, it was to be, and was, paid its regular contract rate. A bridle, made by doubling up a length of the new Columbian rope, was passed under the lugger's stern and made fast by a shackle to the wire rope fall of the crane. With the lugger's bow still afloat, the stern was hoisted so that Scott could work under the vessel from a floating pontoon. After being suspended in this way about 45 minutes, the vessel fell on Scott when the new rope parted about a foot below the knot at the apex of the bridle.
 
 
 4
 The jury under a submission on a general charge, but with special interrogatories (F.R.Civ.P. 49) and without which all of the legal questions would have been perpetually sealed behind the impenetrable mystery of a general verdict,[2] reached these decisive conclusions. It found Delta negligent, the rope defective from a defect which existed when the rope left the custody of Columbian who either knew or should have known of the defect. It also found that the defect in the rope existed while it was in the custody of National and of Placid, but that neither National nor Placid knew or should have known of the defect. The Plaintiff Scott was found to have been 10% Negligent and total damages were fixed at $108,800. There were, of course, appropriate findings of proximate cause.
 
 
 5
 The Judgment.
 
 
 6
 After reducing the award of damages by 10%, the Court entered judgment for Scott against Delta, Columbian, and Placid.[3] It allowed recovery over by Placid against Delta and simultaneously denied Delta's claim over against Placid and Columbian.[4] Subsequently, on motions for new trial it granted a new trial unless the Plaintiff Scott filed a remittitur reducing recovery to $75,000.
 
 
 7
 Plaintiff Scott's Appeal.
 
 
 8
 Scott seeks to set aside the remittitur and reinstate the judgment to $98,200. All defendants within the risk of judgment oppose this on two grounds. The first is that voluntary acquiescence in the remittitur forecloses further review. The second seeks to justify the Court's action on the intrinsic merits. We need not pass expressly on the first. We would assume, without deciding, that until such time as a plaintiff has actually obtained the fruits of a judgment (which is not the case thus far here), he is free to challenge the legal correctness of the Court-enforced remittitur. It would be a strange rule that would keep a plaintiff from challenging the legal correctness of any action having such portentous consequences. But allowing the plaintiff to make the challenge, the burden is a heavy one and the scope of appellate review correspondingly narrow. Great latitude is allowed to a United States District Judge to grant a new trial where in the discretion of the Judge it is needed to prevent an injustice. A clear abuse of that discretion or some extraordinary legal situation must be demonstrated to obtasin relief from such action.[5]
 
 
 9
 Assuming that the Plaintiff Scott is free to assert the attack, we are clear that on the intrinsic merits no abuse of discretion has been shown. This able, experienced trial Judge, on top of the case at all times, was thoroughly aware of the detailed evidence bearing upon the nature and extent of the injuries, the monetary damages sustained, and related factors. At the same time, however, we also reject the attack made by Delta. Reducing the amount of the award to this sum was not the equivalent of a determination by the Court that the verdict was the product of passion and prejudice. What, and all that it was, was an implied finding that on the evidence, the jury had awarded too much. The figure fixed was the outside figure which the Court thought could be approved.
 
 
 10
 Delta's Appeal.
 
 
 11
 In its brief Delta levels a charge of sixteen separate errors, only a few of which warrant discussion. The most basic one is that the evidence was insufficient as a matter of law. We think the trial Judge was correct in submitting this case to the jury, and Delta is bound by the jury findings.
 
 
 12
 Delta's effort to picture itself as one extending gratuitous help to Scott as a man in need hardly bears analysis. Delta was requested by Placid to do the work. Placid expected to, and did, pay Delta's charges for the work. It was therefore, as a minimum, required to exercise reasonable care in the execution of this contractual undertaking.
 
 
 13
 There was ample evidence which the jury could, and presumably did, credit on which to base a finding of negligence. And this evidence did not confine negligence to the defective rope, as such. One major factual controversy between Scott and Delta's superintendent was whether Scott requested and Delta declined to put the stern of the vessel on the bank in order to eliminate the very hazard of the vessel falling. And very much in evidence was the underlying question whether this rope sling should have been used, especially in view of accepted safety factors when applied to maximum breaking strength.
 
 
 14
 10, 11$ This came close, of course, to Scott's own negligence in acquiescing in this method and working under these hazards. But there again there was evidence that permitted the jury to find that because of Delta's superior knowledge in problems of rigging, Scott had a right to rely on the experienced judgment of Delta's representative. And, of course, Delta's efforts to transmute the 10% Contributory negligence finding into a complete bar under Louisiana principles is at least ten years too late as our opinion in Southport Transit Co. v. Avondale Marine Ways, 5 Cir., 1956, 234 F.2d 947, 949, 1956 AMC 1498, recognized, and as to which all doubt has now been dispelled by Kermarec v. Compagnie Generale Transatlantique, 1959, 358 U.S. 625, 629, 79 S.Ct. 406,, 3 L.Ed.2d 550, 1959 AMC 597.
 
 
 15
 As to the other specifications, little need be said. Considering the remittitur discussed above, Delta has not demonstrated, as claimed, that the jury verdict was motivated by passion and prejudice. With the medical testimony, Scott's own complaint of pain and inability to work, expenses incurred and employment opportunities diminished, there was adequate basis for the award. Considering the charge as a whole, we do not think it subject to any of the exceptions now urged by Delta. So far as procedural errors in the handling of evidence, opening statement of counsel, argument of counsel, and the like, if any of these were an error, it was slight and of no significant consequence.
 
 
 16
 This leaves only the contention that the Court erred in allowing Placid to recover indemnity over against Delta and, conversely, in not allowing Delta to recover from Placid. So far as Delta's right of recovery against Columbian is concerned, we think the Judge's indicated basis amply sustained denial of this claim over. This cross claim was unavailing, he said, because 'Delta's liability inheres, not in the defective rope, but in its own separate and distinct acts of negligence which were found by the jury to be a proximate cause of the accident.' (See note 4, supra) Columbian was, at most, then a joint tort-feasor from whom contribution, not indemnity, might be available. See Travelers Ins. Co. v. Busy Electric Co., 5 Cir., 1961, 294 F.2d 139; cf. Halliburton Co. v. Norton Drilling Co., 5 Cir., 1962, 302 F.2d 431, on rehearing, 313 F.2d 380. Neither by written request nor by timely exception to the Court's charge[6] did Delta specifically request the submission of issues pinpointing its own negligence so as to distinguish between general negligence and that specifically connected with the defective rope as such. This amounted to a waiver of a jury trial on these issues and paved the way for an implied finding by the Court in support of the judgment entered by it. F.R.Civ.P. 49.[7]
 
 
 17
 As to Placid's judgment over against Delta, little need be said at this point. This judgment-over flowed from the District Court's judgment holding Placid liable directly to the Plaintiff Scott. For reasons we later discuss we reject this conclusion and find that under these circumstances there was no liability of Placid to Scott, and hence there is no need for Placid to have this relief.
 
 
 18
 This does, however, leave the reverse contention open for our review. But we think the Court was equally correct in denying Delta a right over against Placid. Considering the nature of the jury findings-- and the absence of any other specially requested issues by Delta on this point-- Delta fails to establish as a factual matter any 'warranty' or 'representation' by Placid that the rope either was (a) necessarily to be used in connection with the requested hoisting of the vessel or (b) that it was reasonably fit for that task. Whatever might be the reaches of the theories following in the wake of Ryan where traditional relationships of stevedore-shipowner or repairman-shipowner are involved, the extraordinary relation existing here between Placid and Delta does not automatically invoke like consequences. If the representations were impliedly made, it was a matter of proof and a translation of that proof into an effective, favorable jury resolution of it. If there was evidence, it was not conclusive and the jury's undisclosed determination is now deemed to be against Delta (see note 7, supra).
 
 
 19
 Placid's Appeal.
 
 
 20
 The District Court held that Placid was jointly liable with Delta and Columbian to Plaintiff Scott for the full amount of the judgment. The theory was that Placid breached an implied warranty of merchantable quality and seaworthiness. See note 4, supra. It facilitates matters to discuss separately the normal idea of warranty arising from a sale and those arising under peculiar and recent maritime principles.
 
 
 21
 Apart from the extraordinary liabilities which the rapidly expanding Ryan principle of maritime law might generate, we do not think that the usual warranties of a manufacturer, seller, or supplier of goods attaches to Placid vis-a-vis Scott. The arrangement was essentially one of bearing costs. For a daily specified hire plus the cost of fuel, lube oil, and rope lines, the BARBARA MARIE was chartered to Placid on a time basis. There is nothing suggesting that Scott was relying upon any peculiar or special skill or knowledge on the part of Placid as to these things. We can assume that where a charterer pursuant to the terms of the charter undertakes to furnish the things called for, it must exercise due care. Cf. Park S.S. Co. v. Cities Service Oil Co., 2 Cir., 1951, 188 F.2d 804, 1951 AMC 851, cert. denied, 342 U.S. 862, 72 S.Ct. 87, 96 L.Ed. 648. But here the jury expressly found that Placid did not know nor sould it have known of the defect in this rope.
 
 
 22
 Nor do we think that as to this relationship of time charterer and owner, there is a sufficient analogy to the traditional relationship of stevedore-shipowner, ship repairer-shipowner, to invoke the doctrines now developing from Ryan. This spares us the necessity of making a choice between the Second Circuit's decision in Booth S.S. Co. v. Meier & Oelhaf Co., 2 Cir., 1958, 262 F.2d 310, 1959 AMC 1974, and Italia Societa Per Azioni di Navigazione v. Oregon Stevedoring Co., 9 Cir., 1962, 310 F.2d 481, 1963 AMC 79, certiorari granted and now pending, 372 U.S.963, 83 S.Ct. 1094, 10 L.Ed.2d 127. As each of these two opinions reveal, the problem there dealt with arose from the Ryan concept of 'the warranty of workmanlike service.' The question posed, then, was: in a relationship giving rise to the Ryan warranty of workmanlike service, does the warranty comprehend the absolute suitability of appliances or equipment furnished by such person in the performance of that work? The answers were divergent.
 
 
 23
 While the maritime jurisprudence affords a fresh example that from little acorns big oaks may grow, we would doubt very much that the Ryan notion is to carry over to every conceivable relationship which might exist between a ship and a third party. Particularly would that be true as between a shipowner and a time charterer. By its nature what is obtained is service, not possession and control of the vessel. The latter is characteristic of a bareboat, demise, charter under wihch the temporary user takes over operational control to become, as the nautical rubric states it, one who mans, victuals and supplies the ship. Cf. 46 USCA 181 et seq., especially 186.
 
 
 24
 Conversant as is that distinguished admiralty court with the intricate problems of maritime commerce, we would have much doubt that the Second Circuit by Booth intended to revolutionize the whole notion of the nonoperational status of a time charterer.[8] As Judge Lumbard makes clear for that Court in Drago v. A/S Inger, 2 Cir., 1962, 205 F.2d 139, 1962 AMC 1377, Booth does not remotely suggest a universal warranty of absolute suitability or seaworthiness as to everything and everybody on every ship under every circumstances.
 
 
 25
 The District Court was wrong, therefore, in allowing recovery by Scott against Placid for a non-negligent breach of these asserted warranties. Scott's claim against Placid must be dismissed and for like reasons, Delta's claim over against Placid must also fail.
 
 
 26
 Columbian's Appeal.
 
 
 27
 Columbian levels seven grounds of error to reverse the judgment against it. We do not think there is any real basis for the criticism of the Court's charge for the jury to approach the 'subject empirically.' Taken as a whole, this meant the jury was to use its common sense in the light of the evidence showing the breaking strength, the safety factors, the actual weight of the load and the circumstances existing at the time the rope parted. Nor is there any basis for criticizing the frequent reference to the rope in the 16 special interrogatories. The rope broke. That is what it is all about. There was no way to conceal this operative fact, and in any event the Court was at pains to reassure the jury by appropriate precautionary instruction that no inference was to be drawn from such repetition. Nor are other objections to the Court's charge of any real merit.
 
 
 28
 The real serious question, however, is whether there is any evidence to sustain the verdict of the jury which very plainly found that the rope was defective, and that Columbian knew or ought to have known of the defect at the time the rope left its custody and control.
 
 
 29
 While the matter is not free from considerable difficulty, we have concluded that the evidence was not sufficient to sustain the finding that the rope was defective. It was error for the Court not to have granted the instructed verdict.
 
 
 30
 But in so holding, we do not think this is a case for reversal with directions to render judgment for Columbian. The maximum is a reversal and remand for another trial. Gulf Oil Corp. v. Wright, 5 Cir., 1956, 236 F.2d 46, 53. Much of our difficulty in the case on this score has come from the rather unusual way in which the experts were examined on this phase. When an effort was made on cross examination to elicit testimony on the opinion experts, such as Lecourt, would have as to the safety factor in contrast to the breaking strength, the Court responding to objections in effect required counsel to defer this proof to their own witnesses. No objection to this course is carried forward here as such, but it goes to the very sufficiency of the evidence. Lecourt, for example, is the only witness who comes close to stating that a safety factor of slightly more than one (over breaking strength) would be adequate for a steady lift. Counsel for Placid and others undertook to cross examine him on comparable official Coast Guard and other Government standards[9] for manila rigging lines, etc. But without giving counsel the opportunity of factually developing sufficient information on which reliable rulings could then be made, this examination was cut short with the admonition that it could be proved by their own witnesses.
 
 
 31
 Of course this is a complete frustration of a major purpose of cross examination. Nowhere is the consequence better proved than here. For example, on Lecourt's opinion not subjected to this searching examination, he gives one figure. Utilizing the opprotunity accorded to them by the Court, the other parties produced experts later on. Thier testimony was at substantial variance. But on normal principles, that meant that both for the jury and for us, there was a factual controversy which it was the jury's function to resolve. What counsel were entitled to was a searching cross examination of the witness whose testimony now afford the principal basis for affirming the judgment. Degelos v. Fidelity & Casualty Co., 5 Cir., 1963, 313 F.2d 809.
 
 
 32
 The breaking strength of this rope was stated to be approximately 13,500 pounds. On Lecourt's calculations the weight on the rope sling ran in the neighborhood of 10,000 to 12,000 pounds, but being a double sling this load would be divided. This was well under the manufacturer's breaking strength, but there is yet no evidence in this record that would authorize a finding that the breaking strength and the working load are synonymous. Indeed, the contrary is clear, and the only question is as to the safety factor. The total record indicated from other sources, including the Coast Guard Regulations which would ordinarily be at least some evidence of due care and prudence,[10] that the safety factor was something much more than 1 to 1, some running as high as 5 to 1.
 
 
 33
 Of course had the Court permitted Lecourt to be fully examined and had he adhered to opinions expressed from time to time that for a steady pull, the safety factor of one plus is adequate, we would be faced with quite a different proposition. Here we have to test the sufficiency of his evidence in the light of (a) an undue restriction on cross examination to test his professional opinion, and (b) overwhelming testimony to the contrary from other witnesses. In that posture we are not able to say that the evidence permitted a jury to hold that the use of this rope for this lift was within the reasonable capabilities of the rope so that its failure under such use would permit an inference of defectiveness. In other words, the parting of a line under a weight merely within its tensile breaking strength may perhaps not permit an inference of defectiveness unless there is more, the more being the accepted safety factor.
 
 
 34
 Having said this, we would sound the caveat again that as the case goes back for trial on the limited issues of liability only (not damages), and as to Scott versus Columbian alone,[11] the sufficiency of the evidence is to be measured initially by the trial Judge on the record then and there made. We know for a certainty that the record will not be the same as it is here. It will be a fruitless and artificial thing to match word by word, question by question, answer by answer as to what that record develops in contrast to the present one. Whether that record as then made is or is not legally sufficient is a decision committed in the first place to the trial Judge, and only thereafter to us. When we reach-- if we reach it-- it will then be decided on what is there revealed, not what we found here to be insufficient. See Duke v. Sun Oil Co., 5 Cir., 1963, 320 F.2d 853; Smoot v. State Farm Mut. Auto. Ins. Co., 5 Cir., 1962, 299 F.2d 525, 534; Gulf Oil Corp. v. Wright, 5 Cir., 1956, 236 F.2d 46, 53.
 
 
 35
 Further Proceedings.
 
 
 36
 The result is that we affirm the judgment in favor of Scott against Delta for the reduced amount. We reverse and remand with directions to enter judgment in behalf of Placid. We affirm the denial of Delta's claim over against Placid and Columbian. We reverse the allowance of Placid's claim over against Delta because it is superfluous since Placid is exonerated (but affirm it in the event Scott's judgment against Placid is ever reinstated). And finally, we reverse and remand for a limited new trial and other consistent proceedings the claim as between Scott and Columbian as well as Delta's possible claim for contribution, not complete indemnity.[12]
 
 
 37
 Affirmed in part and reversed and remanded with directions in part.
 
 
 
 [1]
 The cast of characters and their respective insurers is:
 Joseph Ruby Scott, plaintiff
 Delta Engineering Corporation (the Travelers Insurance Company)
 Columbian Rope Company
 Placid Oil Company (Indemnity Insurance Company of North America)
 National Supply Company.
 
 
 [2]
 See Tugwell v. A. F. Klaveness & Co., 5 Cir., 1963, 320 F.2d 866, especially see note 2
 
 
 [3]
 National Supply was dismissed, and we affirm this without necessity of any discussion
 
 
 [4]
 In the unreported reasons for judgment, the Court allowed recovery against Placid despite the jury finding that it neither knew nor should have known of the defect in the rope supplied by it to Scott. The Judge had this to say. 'Placid Oil Company, as time charterer of Scott's boat and in accordance with that charter, supplied the defective rope to Scott. That defect breached Placid's warranty of merchantable quality. Henningsen v. Bloomfield Motors, 32 N.J. 358, 161 A.2d 69, 75 A.L.R.2d 1; Ryan v. Progressive Grocery Stores, 255 N.Y. 388, 175 N.E. 105; Prosser, Torts, 83, p. 495; Frumen & Friedman, Products liability, 19 et seq., and seaworthiness, Mahnick v. Southern S.S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561; See Booth Steamship Co. v. Meier-Oelhaf Co., 2 Cir., 262 F.2d 310; Ace Tractor & Equipment Co. v. Olymphic S.S. Co., Inc., 9 Cir., 227 F.2d 274; Shamrock Towing Co. v. Fitcher Steel Co., 2 Cir., 155 F.2d 69. Consequently, (Placid) * * * is jointly liable to Scott with Delta and Columbian.'
 Placid was, however, given judgment over against Delta on the ground of 'the failure (of Delta) to perform workmanlike service' based on and citing Weyerhaeuser S.S. Co. v. Nacirema Operating Co., 1958, 355 U.S. 563, 79 S.Ct. 438, 2 L.Ed.2d 491, 1959 AMC 501, and the limitless progeny of Ryan Stevedoring Co. v. Pan Atlantic S.S. Co., 1956, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133, 1956 AMC 9. Delta's cross claim against Columbian was denied since 'Delta's liability inheres, not in the defective rope, but in its own separate and distinct acts of negligence which were found by the jury to be a proximate cause of the accident.'
 
 
 [5]
 See Kirby Lumber Corp. v. Laird, 5 Cir., 1956, 231 F.2d 812, 816; Whiteman v. Pitrie, 5 Cir., 1955, 220 F.2d 914, 918; Marsh v. Illinois Central R.R., 5 Cir., 1949, 175 F.2d 498, 500; Missouri Pacific R.R. v. Fusilier, 5 Cir., 1958, 256 F.2d 278; Aubertin v. State Farm Mutual Auto. Ins. Co., 5 Cir., 1958, 252 F.2d 96; Finn v. American Fire & Casualty Co., 5 Cir., 1953, 207 F.2d 113, cert. denied, 1954, 347 U.S. 912, 74 S.Ct. 476, 98 L.Ed. 1969, following the reversal and remand, 1951, 341 U.S. 6, 71 S.Ct. 534, 95 L.Ed. 702, of our original decision, 1950, 5 Cir., 181 F.2d 845
 
 
 [6]
 These matters were raised for the first time by Delta in its supplemental motion filed seven days after entry of the judgment
 
 
 [7]
 'If in so doing the Court omits any issue of fact raised by the pleadings or by the evidence, each party waives his right to a trial by jury of the issue so omitted unless before the jury retires he demands its submission to the jury. As to an issue omitted without such demand the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict.' F.R.Civ.P. 49
 
 
 [8]
 See for example Government Form New York Produce Exchange time charter, appendix D, p. 287, Poor, Charter Parties & Ocean Bills of Lading (4th Ed.1954) which charters the vessel on the following conditions:
 '1. That the Owners shall provide and pay for all provisions, wages * * * of the crew; shall pay for the insurance * * * deck, engine room and other necessary stores * * *.
 '2. That the Charterers shall provide and pay for all the fuel except as otehrwise agreed, Port Charges, Pilotages, Agencies, Commissions, * * * and all other usual expenses except those before stated * * *.'
 Discussing these obligations of the charterer to provide and pay for such things as pilotage, towage, bunkers, the text 7, p. 22, 25, states that though a pilot is provided by charterer 'nevertheless it is the owner and not the charterer who is liable for his negligence in navigating.' And for similar reasons 'the charterer is not liabel for the negligence of the tugs which he has employed to dock the vessel.'
 Under the new found doctrine would the time charterer warrant the abolute seaworthiness of a harbor tug? The tug-worthiness of the tug's performance? A local pilot? Cf. Boudoin v. Lykes Bros. S.S. Co., 1953, 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354, 1954 AMC 2231; McConville v. Florida Towing Corp., 5 Cir., 1963, 321 F.2d 162.
 
 
 [9]
 See 46 C.F.R. 33.10-11; 91.37-25; 29 C.F.R. 9.62
 
 
 [10]
 Cf. Pure Oil Co. v. Snipes, 5 Cir., 1961, 293 F.2d 60, 66, 1961 AMC 1651; Schichter v. Port Arthur Towing Co., 5 Cir., 1961, 288 F.2d 801, 804, 1961 AMC 1164, cert. denied, 368 U.S. 828, 82 S.Ct. 50, 7 L.Ed.2d 32; Davis v. Parkhill-Goodloe Co., 5 Cir., 1962, 302 F.2d 489, 493, 1962 AMC 1720
 
 
 [11]
 As Delta has a potential interest in sharing the burden of the judgment for $75,000 here affirmed against it, it is a proper party for the proceedings on remand and is to be afforded full opportunity for the production of evidence in its own behalf, the examination and cross examination of witnesses, and participation generally as a party therein. Though indemnity is not available, we express no view on whether Delta might have a right akin to contribution from Columbian
 
 
 [12]
 As in note 1, supra, the reference to the parties by their correct identity includes all named liability insurers without regard to whether the formal judgments are in the name of party, the insurer, or either one or both