James **TRUESDELL**

v.

**DELTA MARINE DRILLING COMPANY and Fidelity & Casualty Company of New York**

v.

**MID–SOUTH GENERAL CONTRACTORS, INC. and Zurich Insurance Company.**

**Civ. A. No. 11659.**

United States District Court
E. D. Louisiana,
New Orleans Division.

June 27, 1969.

———————◇———————

A. R. Christovich, Jr., Christovich & Kearney, New Orleans, La., for third-party plaintiff.

David R. Normann, Margot Mazeau, Normann & Normann, New Orleans, La., for third-party defendant.

HEEBE, District Judge:

On April 24, 1969, the motion of third-party defendants, Mid-South General Contractors, Inc., and Zurich Insurance Company, for summary judgment was granted with reasons to be assigned. The Court now assigns the following reasons.

It is here urged that as a matter of law no warranty of workmanlike service was owed by an impleaded marine contractor to the impleading shipowner. Alternatively, the contractor contends that if some warranty be found owing, it cannot under the circumstances have invested the shipowner with any action for indemnity. We believe that all material issues of fact have been expunged from this conflict between contractor and shipowner and that the facts warrant a judgment for the contractor dismissing the third-party complaint.

The contractor, Mid-South General Contractors, Inc., (Mid-South), and its

insurer brought this motion for summary judgment to dismiss the third-party indemnity claim of the shipowner, Delta Marine Drilling Company (Delta). Delta's claim against Mid-South was provoked by the primary action of James Truesdell, a Mid-South employee injured on Delta's "Drilling Barge No. 4," against Delta and its insurer, Fidelity and Casualty Company of New York.[1] For purposes of the motion it is undisputed: that Mid-South was engaged by Delta to dismantle a drilling derrick on the barge; that the dismantling of the derrick by Mid-South was something which, in the normal course of operations, was to be performed after the completion of the stripping of the derrick and the lowering of the crown block; that the duties of stripping the derrick and lowering of the crown were those of Delta Marine; that although the performance of these duties was under the supervision of employees of Delta Marine, certain Mid-South employees, among them the plaintiff Truesdell, at the request of Delta employees and while they were on the barge waiting to begin performance of the Mid-South contract, assisted in the lowering operation; and that it was during the process of lowering the crown, and prior to the beginning of work pursuant to Mid-South's contractual obligation of dismantling the derrick, that the plaintiff's accident and injury occurred.

We start with the assumption that this drilling contractor, having contracted to perform work aboard a vessel[2] lying upon navigable waters, owed a warranty to the vessel owner to perform its work in a reasonable, safe and workmanlike manner, and that the bounds of that warranty were substantially coextensive with the implied warranty generally owed by stevedores in a situation covered by Ryan Stevedoring Co., Inc., v. Pan Atlantic Steamship Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956). The contractor itself stated in a memorandum to the Court that

> "Under *Ryan*, a vessel owner has an absolute liability for the unseaworthiness of the vessel, and is entitled to recovery indemnity from the stevedoring company *and/or other independent contractor* if the latter breached its warranty to perform the contract with the vessel owner in a safe and workmanlike manner." (emphasis added)

We are in substantial agreement with this statement of the law,[3] recognizing, however, the possibility of variations in the warranty which might be called for

1. The fact that the plaintiff has settled his differences with the defendant, Delta, is not determinative of the issues now before us presented by Delta's claim for indemnity over and against Mid-South, although the latter could, were it held to a breach of warranty, contest the reasonableness of the settlement. Waterman Steamship Corp. v. Dugan & McNamara, Inc., 364 U.S. 421, 81 S.Ct. 200, 5 L.Ed. 2d 169 (1960); California Stevedore & Ballast Co. v. Pan Atlantic Steamship Corp., 291 F.2d 252 (9th Cir. 1961).

2. We must assume, favorable to the opponent of this motion for summary judgment, that the Delta Marine "Drilling Barge No. 4" was a "vessel," since the mover for summary judgment made no allegation and offered no evidence to the contrary.

3. The Fifth Circuit in denying indemnity claimed against a time charterer by the owner of a vessel, stated that the *Ryan* warranty is not to be extended to cover automatically "everything and everybody on every ship under every circumstances [sic]," Delta Engineering Corp. v. Scott, 322 F.2d 11, 19 (5th Cir. 1963). However, in *Scott* the court noted the essential difference between the time charterer of a vessel and other marine contractors, stating "by its nature what is obtained [by a time charter] is service, not possession and control of the vessel." 322 F. 2d at 18. In Lusich v. Bloomfield Steamship Co., 355 F.2d 770 (5th Cir. 1966), the court stated simply: "[I]t is now accepted that: (1) the [*Ryan* warranty] applies to contracts for ship services other than stevedoring, including agreements to make ship repairs." 355 F.2d at 776. Also see Singer v. Dorr, 272 F.Supp. 931, 935 (E.D.La.1967) and cases there cited, involving the application of the *Ryan* warranty to a towing agreement.

by the special pertinent differences which might be observed between the work of the "standard" *Ryan* stevedore and other types of marine contractors.[4]

Mid-South contends that it owed no *Ryan* warranty which would render it liable to indemnify Delta for damages arising out of the plaintiff's suit because (1) the plaintiff's injury was not the result of any unseaworthy condition of the "Drilling Barge No. 4"; (2) the plaintiff was injured during the course of an operation which Mid-South had not contracted to do; and (3) even assuming that Mid-South had contracted with Delta to assist in lowering the crown, Mid-South was not in control of that operation.

■■■ We cannot accept the proposition that the conduct of a marine contractor must render the vessel involved unseaworthy before indemnification under the *Ryan* doctrine, Ryan Stevedoring Co., Inc., v. Pan Atlantic Steamship Corp., *supra*, will lie. The many cases which have allowed the action for *Ryan* indemnity to proceed in the face of the failure of the primary action against the shipowner, see e. g., Singer v. Dorr, 272 F.Supp. 931 (E.D.La.1967), point to the conclusion, virtually unavoidable in the light of Weyerhaeuser Steamship Co. v. Nacirema Operating Co., 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491 (1958), that the contractor may owe the *Ryan* warranty of workmanlike service apart

from any actual finding of unseaworthiness.[5] In *Weyerhaeuser* a trial by jury resulted in a finding for an injured longshoreman against the defendant shipowner on the issue of the shipowner's negligence and a finding for the shipowner on the issue of seaworthiness. 355 U.S. at 564, 78 S.Ct. 438. In that situation, the Supreme Court faced the stevedore's contention that the shipowner's negligence barred recovery under the *Ryan* doctrine and held that because the jury's finding of negligence on the part of the shipowner "might have been predicated on a failure of [the shipowner] to inspect the shelter, detect and correct the unsafe condition," 355 U.S. at 568, 78 S.Ct., at 441, the shipowner's indemnity claim should not have been dismissed. Although not expressly so, the result was necessarily based on the fundamental premise that an action for indemnity by a shipowner against a stevedore retains its vitality in the absence of a claim for unseaworthiness against the shipowner. *Cf.* Proudfoot, "The Tarbaby": Maritime Personal-Injury Indemnity Actions, 20 Stanford L. Rev. 423, 428 (1968). Perhaps it may still be said that "the primary source of the shipowner's right to indemnity, as a practical matter, is his nondelegable duty to provide a seaworthy ship," DeGioia v. United States Lines Co., 304 F.2d 421 (2d Cir. 1962), but it would appear in the present state of the law under *Ryan* that the possibility of

4. Whatever those differences might be— and Delta has proposed nothing to suggest any material differences in this case —they will necessarily depend upon the peculiar facts and circumstances of each case and the basic question of which party to the contract involved should bear the responsibility for injury to an employee.

5. This proposition has a narrow but very definite and precise application. In general, a shipowner will not be liable for injury to a longshoreman, in such a situation as to give rise to a right over against the latter's employer for indemnity, in the absence of unseaworthiness of the vessel. However, even in the absence of a finding of unseaworthiness in the suit be-

tween injured employee and shipowner, the possibility of recovery on an indemnity theory by the shipowner against the employer will exist in at least the following situations: (a) where the shipowner is absolved from liability, and pursues the plaintiff's employer for indemnity for attorney's fees and court costs incurred in the successful defense of the suit; (b) where the shipowner, although held liable to the injured plaintiff on a theory of passive negligence, seeks recovery against the employer on a theory of indemnity. In the latter case, *Weyerhaeuser, supra*, would clearly support indemnity where the shipowner's negligence consisted of the failure to discover the contractor's breach of warranty.

liability for unseaworthiness posed by the assumption of work by a contractor aboard a "vessel" subject to the warranty of seaworthiness is the keystone of the contractor's warranty, not the actual finding of an unseaworthy condition in each case of the breach of the warranty.[6] Mid-South's attempt to classify the basis of Delta's liability to the plaintiff as something other than the unseaworthiness of Delta's vessel is therefore inapposite, and we do not reach the possible alternatives to Mid-South's suggested classification posed by Mascuilli v. United States, 387 U.S. 237, 87 S.Ct. 1705, 18 L.Ed.2d 743 (1967), Candiano v. Moore McCormack Lines, Inc., 382 F.2d 961 (2d Cir. 1967), cert. den. 390 U.S. 1027, 88 S.Ct. 1416, 20 L.Ed.2d 284 (1968), and Jackson v. S. S. King's Point, 276 F.Supp. 451 (E.D.La.1967). Of course, the unrebutted possibility that negligence or non-negligent unworkmanlike performance [7] on the part of Mid-South might have contributed to the plaintiff's injury with or without passive negligence [8] on the part of Delta, and the fact that reduction of this possibility to a reasonable certainty by proper proof from the shipowner would, other things being equal, warrant recovery by the shipowner on a *Ryan* indemnity theory, regardless of the seaworthiness of the vessel, would preclude the rendition of summary judgment here if the sea-

worthiness issue were the only basis for the motion.

However, Mid-South must prevail on its motion under the combination of circumstances brought into focus by its two alternative grounds for relief. Mid-South argues that there was, in fact, no contract at all between it and Delta relative to the lowering of the crown and that no warranty of workmanlike service can be implied under *Ryan* for work by Mid-South employees in connection with that operation. In the second alternative, Mid-South contended that, assuming the possibility of a contract, oral or implied, between it and Delta for the lowering of the crown, the fact that the control of the lowering operation remained in the shipowner's supervisors and employees engaged in that work would nevertheless preclude indemnity. While rejecting each of these arguments as a sufficient basis, standing alone, for summary judgment, the situation evoked by Mid-South's statement of material facts and the depositions and affidavits introduced by both parties is appropriate for the granting of a judgment for the contractor for reasons closely analogous to Mid-South's contentions.

■■ Although it is not dispositive, Mid-South's contention that there was no contract between it and Delta for the lowering of the crown must be taken as true for purposes of this motion. The

---

6. *Cf.* Ocean Drilling & Exploration Co. v. Berry Bros. Oilfield Service, Inc., 377 F.2d 511 (5th Cir. 1967), wherein the Court of Appeals stated: "[T]he platform on which the injuries occurred was a 'fixed unmanned structure.' Clearly not designed to float on water, see Offshore Co. v. Robison, 5th Cir. 1959, 266 F.2d 769, 779, 75 A.L.R.2d 1296, such permanent structure is not a vessel and the injured employees do not therefore fall within the definition of seamen. * * * The injured employees are thus not entitled to the warranty of seaworthiness and must rely solely upon the establishment of some independent act of negligence on the part of ODECO as the basis for recovery. This controversy therefore appears to involve none of the factors calling for the application of those special rules governing the obligations and liability of shipowners to seamen." 377 F.2d at 513, and on that basis affirmed the district court's denial of indemnity.

7. See Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co., 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964).

8. "Passive" negligence of a kind which would not preclude the indemnitee from recovering under a *Ryan* warranty would consist, among other things, of the failure to search for and discover the indemnitor's breach of warranty. Weyerhaeuser Steamship Co. v. Nacirema Operating Co., 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491 (1958).

absence of a written contract relative to this operation is too clear from the record to warrant discussion. And although we might, under other circumstances, be reluctant to discount the possibility of an implied contract created by the actions and acquiescences of the representatives of Delta and Mid-South at the job site prior to and during the lowering of the crown by the employees of both Delta and Mid-South,[9] that possibility has been effectively resolved by mover's statement of undisputed fact, which has not been put at issue by Delta, that "the work being performed at the time of [plaintiff's] accident * * * was not work undertaken by Mid-South General Contractors, Inc., pursuant to any contract, written, verbal *or otherwise.*" (emphasis supplied) The Local Rules of this Court state unequivocally

> "All material facts set forth in the statement required to be served by the moving party will be deemed admitted unless controverted by the statement [of the material facts as to which it is contended that there exists a genuine issue to be tried] required to be served by the opposing party." Local Rule 4, subd. E(3).

Mover's statement that there was no contract between Mid-South and Delta for the lowering of the crown was an obvious good faith attempt to eliminate any question as to a possible contract between these parties, and the burden was on Delta to make an issue of the contract question if it considered it to be a real and substantial issue in the case. Delta actually submitted no statement of material facts to oppose that supplied by Mid-South, and we must accept the latter's statement as settling those possible issues to which it is addressed and accept for purposes of this motion the statement that there was no contract, "written, verbal or otherwise," between Delta and Mid-South for the lowering of the crown.

■■ The absence of such a contract cannot dispose of this motion, however; apart from the possibility of an implied contract between the parties relative to the lowering of the crown, the fact that Mid-South and its employees were on board Delta's vessel pursuant to a contract with Delta for the performance of services subsequent to the lowering of the crown could very well serve as the predicate for an implied warranty under *Ryan* for the workmanlike performance of other operations undertaken by Mid-South's employees while aboard Delta's vessel. The *Ryan* warranty is not to be so narrowly construed as to apply only to performance of the obligations specifically undertaken in the shipowner-contractor agreement. Where the contractor

---

**9.** We do not read *Ryan* and its progeny to preclude the possibility of an implied warranty of workmanlike service merely because the contract between shipowner and contractor may not have been written or expressed. It is true that *Ryan* itself dealt with a contract containing certain express assurances that the stevedore would properly perform its work, see Ryan Stevedoring Co., Inc., v. Pan Atlantic Steamship Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956) ; Weyerhaeuser S.S. Co. v. Nacirema Operating Co., 355 U.S. 563, 565, 78 S.Ct. 438, 2 L.Ed.2d 491 (1958), but it cannot reasonably be suggested that a theory as thoroughly and rationally evolved as the *Ryan* doctrine should be made to turn on the recitation of such conspicuously typical, axiomatic language. *Ryan* stated quite simply, in fact, "The shipowner here holds petitioner's uncontroverted agreement to perform all of the shipowner's stevedoring operations at the time and place where the cargo in question was loaded. That agreement *necessarily* includes petitioner's obligation not only to stow the pulp rolls, but to stow them properly and safely. Competency and safety of stowage are inescapable elements of the service undertaken. This obligation is not a quasi-contractual obligation implied in law or arising out of a noncontractual relationship. *It is the essence of petitioner's stevedoring contract.*" (emphasis supplied) 350 U.S. at 133, 76 S.Ct. at 237. Whatever may be the rule with respect to express contracts, obviously in the case of a contract which itself is implied, the *Ryan* warranty should also be implied absent some expression by the parties to the contrary.

boards a vessel prior to the actual beginning of work under its contract, it should generally be held to warrant its "workmanlike" preparation for the work, and indeed the workmanship of all the acts of its workmen while present on the vessel pursuant to the contract even though not actually engaged in an operation affirmatively in furtherance thereof. To hold otherwise would be to dismiss the realities of these business situations, and in fact to imply ultimately that acts constituting incorrect performance of the contract would not come within the scope of the *Ryan* warranty.

We also reject Mid-South's argument that the mere fact that control of the lowering operation remained in the shipowner's supervisors and employees, who also and primarily performed that work, would preclude indemnity. We do not think "control" by the contractor necessarily essential to the *Ryan* warranty. It is primarily the *presence* of the contractor and its employees on the vessel, in a position to actively (but not necessarily in a controlling or supervisory capacity) create some condition for which the shipowner may be absolutely liable which requires that the contractor perform its contract in a workmanlike manner. The *Ryan* warranty rests, not necessarily on the violation of duties which might be placed within the responsibility of the stevedore or contractor who is in some sort of control of the vessel, but simply on the negligent, or in some cases non-negligent, see Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co., 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964), mistakes of stevedores and other contractors and their employees, present on a vessel in a contract-work situation, and upon whom the responsibility for injury to an employee should equitably and consensually rest.

Although we think neither that a compartmentalization of the activities of a contractor's employees aboard the vessel should be used to automatically preclude the placement of responsibility for injury on the contractor in any situation not specifically covered by the contract, nor that the placement of such responsibility on the contractor is totally dependent on the contractor's having control of the vessel, we do hold that a marine contractor does not impliedly warrant the performance of his employees who, as in this case, have boarded the vessel preliminary to the beginning of work for the contractor, but have not yet begun work, and who, at the time of the injury in question, are engaged in an operation under the sole supervision and control, and at the request, of the shipowner's representatives, and as to which operation there was no contract, written, verbal or implied, between contractor and shipowner. In the situation described, which, it is undisputed, was the situation in this case, it would be inequitable and inconsistent with the theme of the Ryan warranty to hold the contractor to a warranty of the workmanship of its employees; and we specifically find it impossible, under any reasonable view of this situation and the undisputed facts herein, for any fact finder to imply a warranty consistent with the *Ryan* doctrine.

We have elsewhere noted our view that the *Ryan* doctrine "is founded soundly on an attempt to equitably place the burden of defendant and paying claims on the one party of the two who was in control of the vessel and whose action resulted in the claim being brought * *." Singer v. Dorr, 272 F.Supp. 931, 936 (E. D.La.1967). Along the same lines, the Supreme Court has stated

"[L]iability should fall upon the party best situated to adopt preventive measures and thereby to reduce the likelihood of injury." Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co., 376 U.S. 315, 324, 84 S.Ct. 748, 754, 11 L.Ed.2d 732 (1964).

Although the exclusivity provisions of the Longshoremen's & Harbor Workers' Compensation Act, 33 U.S.C. § 901 et seq., § 905, would seem to preclude a theory of contractor-shipowner indemnity (in cases where the injured plaintiff was an employee of the contractor covered

by the Compensation Act) founded solely on tort principles,[10] a view of the *Ryan* warranty as a set of responsibilities flowing between two contracting parties by reason of their agreement *and comporting with equitable and tort principles* is certainly not in conflict with the Act or the cases.[11]

But whether the *Ryan* warranty be considered an equitable policy founded on tort principles, *cf.* Proudfoot, "The Tarbaby": Maritime Personal-Injury Indemnity Actions, 20 Stanford L.Rev. 423, 424, 432–434, 445–477 (1968), or an equitable appendage of the contractual relationship between shipowner and contractor, the result is the same here: the party in the best situation to prevent the injury to the plaintiff, and in the most logical position to bear responsibility of that injury, was Delta; equitably, Delta must bear the burden, nor can the so-called "contractual" warranty implied under *Ryan* place the responsibility any differently. There is simply no room to suppose that Mid-South contracted for, or otherwise assumed, responsibility for the performance by the plaintiff of work for Delta, done by the plaintiff solely at Delta's request, and under Delta's complete supervision and control.

It should be clear that our holding is not based simply on the fact that control of the injured plaintiff's activities at the time of his accident was vested in Delta's employees. Under our view of the *Ryan*

warranty, situations can certainly be imagined in which the contractor should bear the burden of injury even though control of either the vessel, or the particular work situation of the injured employee, might be in the hands of the shipowner; but we find no possibility for responsibility by the contractor in the situation presented by the undisputed facts of this case. Nor, on the other hand, is our decision dependent on a finding, obliquely suggested by the contractor at oral argument on the motion, that the plaintiff might have had the status of a borrowed employee of Delta at the time of his injury. The undisputed facts developed by the mover did not, in our opinion, go so far as to establish a borrowed employee status, but we do not deem the status question controlling. The question presented by this motion for summary judgment was not one of the rights of employees, or even one of which company, shipowner or contractor, was the *pro hac vice* employer, but simply which party should bear the burden under an implied *Ryan* warranty of the injured employee's suit in the case before us.

There being no material issues of fact herein, and the undisputed facts precluding the possibility of an implied warranty on the part of the mover, the motion for summary judgment dismissing the third-party complaint is granted. And there being no just reason for delay, the clerk shall forthwith prepare a judgment in accordance herewith for the Court's approval.

---

10. The *Ryan* decision specifically left the question open, 350 U.S. 124, at 128–132, but the possibility of indemnity based on tort alone has been foreclosed in this circuit by Ocean Drilling & Exploration Co. v. Berry Bros. Oilfield Service, Inc., *supra.*

11. Thus, *Italia's* statement quoted in the text that "liability should fall upon the party best situated to adopt preventive measures and thereby to reduce the likelihood of injury," refers to *the party to the contract between shipowner and maritime contractor* best situated to adopt preventive measures and thereby to reduce the likelihood of injury, and indicates that the contracting parties must have impliedly agreed to that equitable

placement of responsibility. It will appear from a cursory reading of the *Italia* case that the court made its statement that "liability should fall upon the party best situated to adopt preventive measures * * *" in order to bolster its conclusion, necessary to a finding of liability on the part of the stevedore for the non-negligent supplying of defective equipment, that a stevedore's *Ryan* warranty was not based on tort standards. But we have used the phrase "equitable and tort principles" to refer, not (as did *Italia*) to the fixed standards of care imposed by tort law, but to liability which is essentially imposed on two contracting parties rather than consciously and freely adopted by agreement.